79 F.3d 1129
 40 Cont.Cas.Fed. (CCH) P 76,904
 Jay P. ALTMAYER, Nancy Hirschler, Jane Beskin, Amsouth Bank,
N.A., as Trustee under the will of Claire Pollock, and Jay
P. Altmayer and Amsouth Bank, N.A., as co-trustees under the
will of Marvin C. Altmayer, Appellant,
v.
Roger W. JOHNSON, Administrator, General Services
Administration, Appellee.
 No. 95-1223.
 United States Court of Appeals,
Federal Circuit.
 March 21, 1996.
 
 Appealed from the Board of Contract Appeals, General Services Administration.
 W. Alexander Moseley, Hand, Arendall, Bedsole, Greaves & Johnston, L.L.C., Mobile, Alabama, submitted, for appellant.
 John K. Lapiana, Attorney, Department of Justice, Washington, D.C., submitted, for appellee. Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director and Harold D. Lester, Jr., Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., were on the brief, for appellee. Also on the brief were Robert W. Schlattman and Diana Parks Curran, General Services Administration, of counsel.
 Before RICH, MAYER, and LOURIE, Circuit Judges.
 MAYER, Circuit Judge.
 
 
 1
 Jay P. Altmayer; Nancy Hirschler; Jane Beskin; AmSouth Bank, N.A., as trustee under the will of Claire Pollack; and Jay P. Altmayer and AmSouth Bank, N.A., as co-trustees under the will of Marvin C. Altmayer (collectively "Altmayer") appeal the decision of the General Services Administration Board of Contract Appeals in Altmayer v. General Services Administration, 95-1 B.C.A. (CCH) p 27,515, 1995 WL 53976 (GSBCA 1995), granting in part and denying in part Altmayer's appeal of a contracting officer's final decision. Because the board erred in denying Altmayer's subcontractor, Haas Construction, Inc., recovery of its extended home office overhead under the formula set out in Eichleay Corp., 60-2 B.C.A. (CCH) p 2688, 1960 WL 538 (ASBCA 1960), aff'd on recon., 61-1 B.C.A. (CCH) p 2894, 1960 WL 684 (ASBCA 1960), we affirm-in-part, reverse-in-part, vacate-in-part, and remand.
 
 Background
 
 2
 This appeal arises from a contract that the General Services Administration ("GSA" or "government") awarded to Altmayer on December 30, 1991, for a ten-year lease of office space owned by Altmayer in Savannah, Georgia. Prior to lease commencement, Altmayer was required to "build out" the space, which was to be used as a United States Attorney's office, in accordance with the solicitation's specifications and with plans to be provided by the government. As amended, the contract required Altmayer to complete these renovations by February 25, 1993.
 
 
 3
 Altmayer subcontracted the renovation work to Haas Construction, Inc. Altmayer and Haas contracted initially for demolition work prior to the renovations and simply modified that contract through the issuance of change orders for each subsequent module of work to be performed by Haas. In August 1992, Haas established a critical path schedule, which set forth all of the critical tasks to be performed on the contract in a logical sequence that would ultimately lead to timely completion of the contract.
 
 
 4
 As set out in its critical path, Haas planned to install wood trim to be ordered by the government and then paint the interior walls over the course of fifteen days, between November 17, 1992, and January 5, 1993. It also planned to install carpet the government was to specify over fifteen days, between December 15, 1992, and January 19, 1993. The government's carpet selection was especially critical because the manufacturer could not deliver the carpet until six to eight weeks after an order had been placed. Consequently, to begin carpet installation in accordance with Haas's critical path schedule, the carpet had to be ordered in mid-October 1992. These were the last two tasks to be completed on Haas's critical path, after which it was to do the final clean-up and complete its punch list items.
 
 
 5
 GSA had expected to order the carpet and wood trim by August 1992, but it did not do so. Throughout the balance of 1992, Altmayer continued to impress upon the government the importance of obtaining the carpet and wood finish selections if the contract was to be completed on time. Its pleas, however, were unavailing.
 
 
 6
 Although the government delivered a finish schedule, identifying its carpet and wood trim selections, in October 1992, it told Haas not to use the schedule because it would be changed. In November, the government furnished a revised finish schedule and instructed Altmayer to order its chosen carpet. Just two weeks later, however, the government directed Altmayer to put the order "on hold" because of price concerns. Similarly, it designated a particular trim, which was not on the original contract, in November 1992. Haas explained that its selection would increase the price. As a result, the parties, including a representative of the U.S. Attorney's office, spent the next three months discussing available woods and stains, and their respective prices. On February 24, 1993, the government directed Altmayer to order a particular wood trim, but it did not designate a stain. Moreover, the parties still had not agreed on a price for the trim. The government later substituted a different trim.
 
 
 7
 Because of Altmayer's concern that the government's indecision about its wood trim and carpet selections had precluded completion of the contract on time, it requested an extension of the contract and a price adjustment on January 7, 1993. The contracting officer promised to respond by January 26, 1993, but he failed to do so. On February 9, 1993, Altmayer again requested an extension, and again received no immediate response. On March 1, 1993, four days after the originally-scheduled date for completion, the government granted Altmayer an extension until June 1, 1993. However, it denied any monetary liability for the delay, contending that Altmayer was concurrently responsible for a number of reasons the board ultimately rejected and the government does not appeal.
 
 
 8
 Eventually, on March 3, 1993, the government gave Altmayer its carpet selections. However, it was not until March 15, 1993, that it finished selecting the wood trim. Haas then completed the renovations, and on May 28, 1993, the lease began.
 
 
 9
 Soon thereafter, Altmayer submitted a certified claim to the contracting officer for amounts due to both Altmayer and Haas as a result of the delay. On August 30, 1993, the contracting officer denied the claim in its entirety. Altmayer appealed that decision to the board, claiming inter alia, Haas's extended home office overhead as calculated under the Eichleay formula.
 
 
 10
 The board held that the government's failure to select carpet material until March 1993, after the date originally contemplated for contract completion, was the sole cause of the contract's late completion. It explicitly rejected the government's contention that Altmayer was partly responsible for the delay because all work, save for the carpet and trim items, had not been finished by February 25, 1993.
 
 
 11
 As for damages, the board held, in pertinent part, that the government was liable for the salaries and taxes of two of Haas's supervisors who remained on site through the extended performance period. It also awarded certain direct costs associated with the two supervisors. The board then granted ten percent of the sum of the supervisors' salaries and the associated direct costs to compensate Haas for its "home office costs" during the delay. However, the board denied recovery of extended home office overhead as calculated under Eichleay. Altmayer, as the prime contractor, appeals.
 
 Discussion
 
 12
 The primary issue* before us is whether the board erred in holding that Haas was not entitled to recover its extended home office overhead under the Eichleay formula. We review the board's decision on questions of law de novo. 41 U.S.C. § 609(b) (1994); Wickham Contracting Co. v. Fischer, 12 F.3d 1574, 1577 (Fed.Cir.1994). On questions of fact, our review focuses on whether the board's findings are "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or ... not supported by substantial evidence." 41 U.S.C. § 609(b). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Mech-Con Corp. v. West, 61 F.3d 883, 885 (Fed.Cir.1995) (quoting United States v. General Elec. Corp., 727 F.2d 1567, 1572 (Fed.Cir.1984)).
 
 
 13
 Home office overhead costs are those that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract. See Wickham, 12 F.3d 1574, 1578. In contracting with the government, a company necessarily includes a portion of home office overhead expenses, which it calculates based on the contract's duration, in its estimate of costs to perform the contract. See Capital Elec. Co. v. United States, 729 F.2d 743, 748 (Fed.Cir.1984) (Friedman, J., concurring). When the government delays or disrupts contract performance, ultimately requiring that it be extended, the contractor's stream of income from the government for the direct costs it has incurred under the contract is reduced or interrupted. See generally Wickham, 12 F.3d at 1577. However, home office overhead continues to accrue throughout both the original and extended performance periods, regardless of direct contract activity. Id.; Interstate Gen. Gov't Contractors v. West, 12 F.3d 1053, 1057 (Fed.Cir.1993). This, of course, results in a reduction or interruption of payments for overhead, especially when, as here, the contractor has prepared a critical path schedule, for any delay along the critical path results in the delay of the overall project. As the board noted in this case, "[i]nstallation of the carpet was on the critical path for construction; until it was done, the renovation could not be finished." 95-1 B.C.A. (CCH) at 137,122.
 
 
 14
 The Eichleay formula approximates extended home office overhead costs by calculating a daily overhead dollar amount for the contract in question and multiplying that figure by the number of days of delay. Mech-Con, 61 F.3d at 886; see also Wickham, 12 F.3d at 1577 n. 3. When the government disrupts or delays a contract, thereby reducing the contractor's stream of direct costs against which to charge its overhead costs, "it is appropriate to use the Eichleay formula to calculate extended home office overhead instead of the fixed percentage rate formula because the latter would not adequately compensate the contractor for extended home office overhead." C.B.C. Enters., Inc. v. United States, 978 F.2d 669, 674 (Fed.Cir.1992). Indeed, "when direct costs are decreased to naught, employment of a fixed percentage rate absurdly denies any otherwise demonstrably reimbursable extended home office overhead costs." Id. at 671; accord Capital Elec., 729 F.2d at 746 & n. 6. Normally then, the Eichleay formula is applied in cases like this one where "the delay extends performance of the contract beyond the original completion period thereby increasing the period of time" over which home office overhead expenses are incurred. Interstate, 12 F.3d at 1060. Entitlement to Eichleay damages turns on whether the contractor can establish: (1) a government-caused delay; (2) that it was on "standby"; and (3) that it was unable to take on other work. Mech-Con, 61 F.3d at 886.
 
 
 15
 It is undisputed that the government was the sole cause of the delay in contract performance here. Its indecision about carpet and wood trim selections resulted in a three-month extension. However, the board found the second element of entitlement to be lacking in Haas's claim. It held that neither Altmayer nor Haas was ever placed "in a standby position, such that work was not being performed on the contract." 95-1 B.C.A. (CCH) at 137,124. Rather, the board concluded that Haas performed "additional work," creating a stream of income against which to charge its extended home office costs. Id. Therefore, it denied recovery under the Eichleay formula. See Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1582 (Fed.Cir.1993); C.B.C. Enters., 978 F.2d at 671-72, 675 ( Eichleay formula inapplicable to home office overhead costs incurred by reason of a contract extension to perform additional work).
 
 
 16
 Altmayer argues that the board was wrong as a matter of fact in finding that Haas performed "additional work" under the contract. Altmayer also contends that the board erred as a matter of law in holding that Haas did not meet the "standby" requirement. We agree.
 
 
 17
 "The proper standby test focuses on the delay ... of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform." Interstate, 12 F.3d at 1058. Indeed, the linchpin to entitlement under Eichleay is the uncertainty of contract duration occasioned by government delay or disruption. See Wickham, 12 F.3d at 1577 (government contractors may use the Eichleay formula when disruption or delay has made the length of the performance period uncertain); C.B.C. Enters., 978 F.2d at 672 (contractors can use Eichleay when disruption or delay has "cast a cloud of uncertainty over the length of the performance period of the contract").
 
 
 18
 That the delay caused here by the government's indecision over the carpet and wood trim was for an uncertain duration during which Haas had to remain ready to complete the renovation project is beyond serious question. As early as September 1992, recognizing that the carpet needed to be ordered by mid-October for Haas to meet its scheduled installation date, Altmayer notified the government that it needed the finish schedules quickly. Altmayer and Haas continued to notify the government throughout the remainder of 1992 that the government's failure to order the carpet and wood trim jeopardized timely completion of the contract. While the government twice furnished Haas with finish schedules, it quickly cancelled them both. Then, in 1993, Altmayer twice requested a contract extension and price adjustment. The first request went unanswered despite assurances from the government that a reply was imminent. The government did not respond to the second request until March 1993, four days after the renovations were to have been completed.
 
 
 19
 This procrastination and nonresponsiveness made the length of the performance period extremely uncertain. The government strung Haas along from October 1992 until March 1993, never fully suspending the contract. Indeed, between October 1992 and March 1993, it so disrupted and delayed Haas's performance that it was never able to perform the contract as planned. Under such circumstances, we have permitted recovery under Eichleay. See C.B.C. Enters., 978 F.2d at 674.
 
 
 20
 As a result of the government's dilatoriness, Haas incurred three additional months of home office overhead expenses but no additional direct billings against which to charge them. While the board found, and the government argues, that Haas performed "additional work," that finding is not supported by substantial evidence. In fact, the board cites no evidence at all. The government, on the other hand, points to Haas's progress payment requests to Altmayer and change orders to their renovation contract in arguing that Haas was performing additional work "throughout the extended buildout performance period." These documents, however, do not establish that the work performed under the change orders, for which Haas was billing Altmayer, was additional or new work. They simply identify the work that Haas was to perform under those change orders. However, the board explicitly found that Altmayer and Haas entered a contract "for demolition efforts before any renovation began," and simply amended that contract through the issuance of change orders for each phase of the renovation project. 95-1 B.C.A. (CCH) at 137,118. In light of their contractual arrangement, it cannot be said that the documents on which the government relies establish that Haas performed additional work.
 
 
 21
 Nor is recovery under Eichleay compromised because Haas continued to perform minor tasks throughout the period of government indecision. The standby test does not require that the contractor's work force be idle. Interstate, 12 F.3d at 1057. There is no requirement that a contract be suspended before a contractor is entitled to recover under Eichleay. Indeed, in Eichleay itself, "[p]erformance of the contracts was at no time completely suspended." Eichleay Corp., 61-1 B.C.A. (CCH) at 15,117; see also Capital Elec., 729 F.2d at 743; C.B.C. Enters., 978 F.2d at 674. As the D.C. Circuit said in rejecting an argument that the Eichleay formula is only applicable to contract suspensions, as opposed to contract extensions:
 
 
 22
 It may be true that when a project is extended (not suspended), the work will be ongoing and thus income from the project will continue to be applied to home office overhead costs. On the other hand, when work is extended, the project income will be spread over a longer period of time and, consequently, less of the income may be allocated to home office overhead costs. Thus, an extended project--like a suspended project--may result in reduced income vis-a-vis overhead costs.
 
 
 23
 Williams Enters. v. Sherman R. Smoot Co., 938 F.2d 230, 235 (D.C.Cir.1991). This is precisely our situation.
 
 
 24
 Haas continued to do some work during the period of government indecision, but it was on minor items "susceptible to prompt completion." 95-1 B.C.A. (CCH) at 137,120. Haas did not need to complete these minor tasks before the originally-scheduled contract completion date because the renovation could not be completed until several weeks after the carpet had been delivered. Notwithstanding Haas's continuous work on minor contract items, the fact remains that the overall project income was spread over an additional three-month period; hence, less of that income was allocable to home office overhead costs. Therefore, Haas's work on minor contract items does not deprive it of recovery under the Eichleay formula.
 
 
 25
 Because Haas met the standby test and established that the government-imposed delay was for an uncertain duration, it presented a prima facie case of entitlement to Eichleay formula damages. See Mech-Con, 61 F.3d at 886; Wickham, 12 F.3d at 1577 (when a contractor is on standby, it "is effectively prohibited from making reductions in home office staff or facilities or by taking on additional work"); Capital Elec., 729 F.2d at 748 (Friedman, J., concurring) (it is not usually practicable to lay off home office employees during short and indefinite delays (quoting Fred R. Comb Co. v. United States, 103 Ct.Cl. 174, 183-84 (1945))). "The burden then shifts to the government to present rebuttal evidence or argument showing that the contractor did not suffer or should not have suffered any loss because it was able to either reduce its overhead or take on other work during the delay." Mech-Con, 61 F.3d at 886. It has not met this burden.
 
 
 26
 The government points once again to Haas's progress payment requests and change orders in arguing that Haas in fact performed "other work" during the delay. As we have said, however, those documents do not establish that the described work was "other work." The government also claims that Altmayer presented evidence that Haas was obtaining and performing "additional work" throughout the extended performance period. But the testimony upon which it relies simply establishes Haas and Altmayer's contracting arrangement. Moreover, the document to which the government points shows Haas's total billings from August 31, 1992, to May 28, 1993; it does not show that Haas performed additional work to absorb its extended home office overhead. That Haas may have bid on other contracts "at the very end" of the subject contract, does not establish that it was able to reduce its overhead or take on other work during the delay, which for practical purposes occurred from November 1992 through February 1993. Nor does the mere fact that Haas had not reached its bonding capacity necessarily preclude application of the Eichleay formula. See Interstate, 12 F.3d at 1058.
 
 
 27
 Consequently, because Haas met the prerequisites for entitlement to its extended home office overhead costs under the Eichleay formula, the board erred in denying them. Wickham, 12 F.3d at 1580-81. A fixed percentage rate calculation of Haas's reimbursable home office overhead costs was impermissible, and must be vacated.
 
 Conclusion
 
 28
 Accordingly, the decision of the General Services Administration Board of Contract Appeals is affirmed-in-part, reversed-in-part, vacated-in-part, and the case is remanded for further proceedings consistent with this opinion.
 
 COSTS
 
 29
 Altmayer shall have their costs.
 
 
 30
 AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED.
 
 
 
 *
 Altmayer also appeals the board's denial of its requested adjustments for the loss of rental income from February to May 1993, the costs associated with allegedly accelerating project completion, and profit on the costs it incurred because of the delay. We have considered Altmayer's arguments and are not persuaded that the board erred in denying those claims. Consequently, we affirm those aspects of the decision